## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  JOSEPH TARANGO,                                      No. 7-07-12829 JL

      Debtor.

SOUTHWEST FINANCIAL SERVICES OF
LAS CRUCES, INC.,

      Plaintiff,

v.                                                          Adversary No. 08-1027 J

JOSEPH TARANGO,

      Defendant.

### MEMORANDUM OPINION

THIS MATTER is before the Court on cross motions for summary judgment.[1]  Plaintiff

Southwest Financial Services of Las Cruces, Inc. ("Southwest Financial") filed a complaint

against Defendant Joseph Tarango asserting that the outstanding balance due under a loan

Defendant obtained from Southwest Financial constitutes a non-dischargeable debt under 11

U.S.C. § 523(a)(2)(A) and (a)(6) based on the fact that the loan in question was part of a sham

loan scheme perpetuated by Southwest Financial's former president, Joseph Valdez.  Southwest

Financial asserts that summary judgment should be granted on its claim for non-dischargeability

of debt under 11 U.S.C. § 523(a)(2)(A) based on evidence that Mr. Tarango did not intend to

repay the loan at the time he executed the loan agreement and knew or should have known that

his actions would deceive Southwest Financial.  Mr. Tarango requests summary judgment based

---

[1]Plaintiff's Motion for Summary Judgment and Plaintiff's Memorandum in Support of Motion [for] Summary Judgment were filed on May 8, 2008. *See* Docket No. 28 and Docket No. 29.  Defendant filed a response to Plaintiff's Motion for Summary Judgment on May 26, 2009. *See* Docket No. 35.  Defendant Joseph Tarango filed a Motion for Summary Judgment and Memorandum Brief in Support of Defendant's Motion for Summary Judgment on May 10, 2009. *See* Docket No. 30 and Docket No. 31.  Southwest Financial filed a response to Defendant's Motion for Summary Judgment on May 27, 2009.  *See* Docket No. 37.  Southwest Financial filed a reply to Defendant's response to Plaintiff's Motion for Summary Judgment on June 16, 2009.  *See* Docket No. 39.

on his affirmative defense that he was an intended third-party beneficiary of a settlement agreement between Southwest Financial and Mr. Valdez concerning the improper loans.

After consideration of the motions, the responses thereto, and Southwest Financial's reply, the Court finds that fact issues concerning Mr. Tarango's intent preclude summary judgment on Southwest Financial's claim for non-dischargeability under 11 U.S.C. § 523(a)(2)(A). Based on the terms of the Settlement Agreement, the Affidavit of Gene Lee, and the position advocated by Southwest Financial in its Response to Defendant's Motion for Summary Judgment ("Response")(Docket # 37), the Court finds that there are sufficient facts from which the Court could conclude that Mr. Tarango is an intended third-party beneficiary of the Settlement Agreement. Furthermore, fact issues remain as to whether there is a material breach under the Settlement Agreement. Because issues of material fact remain, the Court will also deny Mr. Tarango's motion for summary judgment.

<u>Summary Judgment Standards</u>

It is appropriate for the Court to grant summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c), made applicable to adversary proceedings by Fed.R.Bankr.P. 7056. In considering a motion for summary judgment, the Court must "'examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Wolf v. Prudential Inc. Co. of America,* 50 F.3d 793, 796 (10th Cir. 1995)(quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990)). Cross motions for summary judgment raise an inference that summary judgment may be appropriate. *In re Baines,* 337 B.R. 392, 396 (Bankr.D.N.M.

2

2006). Nevertheless, before a Court may grant summary judgment, the Court must satisfy itself that the requesting party has independently satisfied the requirements of Fed.R.Civ.P. 56(c). *Harris v. Beneficial Oklahoma, Inc., (In re Harris),* 209 B.R. 990, 998 (10th Cir. BAP 1997)(citation omitted). *See also, In re Cox,* 408 B.R. 407, (Bankr.D.Kan. 2009)(stating that "cross motions are to be considered independently, and summary judgment is not appropriate if disputes remain as to any material fact.")(citing *Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000)). "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial" through affidavits or other supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

UNDISPUTED FACTS

The following facts relating to the parties' claims are not in dispute:

1. Joseph Tarango executed a Promissory Note ("Note") in favor of Southwest Financial dated February 28, 2002 in the original principal amount of $6,637.41.

2. At the time Mr. Tarango executed the Note, Joseph Valdez was president of Southwest Financial.

3. At the time Mr. Tarango executed the Note, he had an agreement with Mr. Valdez to give the proceeds of the Note to Mr. Valdez who would then make the payments due under the Note.

4. When Mr. Tarango received a check for the proceeds of the loan represented by the Note, he cashed it and gave all of the money to Mr. Valdez.

5. Mr. Tarango made no payments on the Note with his own funds.

6. On separate occasions, both before executing the Note, and after, Mr. Tarango borrowed money from Southwest Financial and paid it back.

7. Gene Lee is the majority shareholder, secretary, and a director of Southwest Financial.

8. Mr. Valdez was president and manager of Southwest Financial in 2002.

9. In 2002, Mr. Lee became concerned about certain loan practices that had been occurring at Southwest Financial.

10. In 2002, Mr. Lee discovered through an examination of the records of Southwest Financial and copies of bank checks deposited into Southwest Financial's bank account that people other than the named borrower, including Mr. Valdez, were making payments on loans.

11. Mr. Lee eventually developed a list of questionable accounts to present to Mr. Valdez.

12. Mr. Valdez informed Mr. Lee that Mr. Valdez, and not the named borrower, actually received the money from several of the questionable accounts.

13. Among the questionable accounts that Mr. Lee identified was an account for Lainee Grubbs, and an account for Shelley Wolfe. *See* Plaintiff's Response to Defendant's Motion for Summary Judgment ("SW Response"), Exhibit 27 (letter dated October 28, 2002 from Mr. Lee to Mr. Valdez identifying Shelly Wolfe as one of "the accounts concerning which questions have arisen); *See* Memorandum Brief in Support of Defendant's Motion for Summary Judgment ("Defendant's Brief"), Exhibit B, pages 53 – 54 (letter dated February 26, 2003 from Mr. Lee to Mr. Valdez identifying Account Number 15217 for Lainee Grubbs among the "list of accounts . . . about which for various reasons questions have arisen.").

4

14. Following Mr. Valdez's confession, the parties continued to refine the terms of the separation of Mr. Valdez from Southwest Financial.

15. Ultimately, Mr. Lee, Southwest Financial and Mr. Valdez entered into a Settlement Agreement dated November 3, 2003 to terminate Mr. Valdez's relationship with Southwest Financial and address the questionable accounts.

16. The Settlement Agreement recites that

   [d]uring the course of his employment with Southwest, Valdez made a number of loans to third parties, or in the name of third parties, the proceeds of which were intended for and in fact received by Valdez.

   Settlement Agreement, ¶ 3.
   . . .

17. The Settlement Agreement further recites that Mr. Valdez's actions in making loans to third parties wherein the proceeds were intended for and received by Mr. Valdez "violated company policy and would not have been approved" by Southwest Financial. Settlement Agreement ¶ 5.

18. According to the Settlement Agreement, Exhibit A to the Settlement Agreement was to identify all loans that Mr. Valdez made during the course of his employment with Southwest Financial to third parties, or in the name of third parties, the proceeds of which were intended for and in fact received by Mr. Valdez. Such loans are identified in the Settlement Agreement as "Accounts".

19. The total amount of the loans identified in Exhibit A to the Settlement Agreement exceeds $100,000.00.

20. The loan to Mr. Tarango is identified on Exhibit A to the Settlement Agreement.

21. Paragraph 2 of the Settlement Agreement provides, in part:

   Notwithstanding this remaining balance due Southwest and Gene Lee promise, while Valdez is not in default of this Agreement, to consider, for the proposes of this

5

Agreement, the Accounts as paid in full. It is expressly agreed that Southwest will not report to any credit reporting agency that the Accounts have been charged off but neither will Southwest report the Accounts as settled or paid. Southwest will not provide any additional reports to any credit reporting agency regarding the Accounts.

22. Paragraph 3 of the Settlement Agreement provides, in part:

> In consideration for the promise granted by Southwest in paragraph 2 immediately above, Valdez promises or affirms:
>
> a) That the list of persons and loans shown in Exhibit A is complete and accurate;
> b) That he has not at any time made any other loan for the same or similar reasons or under the same or similar circumstances as the reasons and circumstances relating to those customer loan accounts shown in Exhibit A;
> c) That he has not at any time in any manner used or diverted Southwest's or its customers' assets for his own personal use, other than in the cases of the customer loan accounts shown in Exhibit A;
> . . .
> f) That as of the last day of his employment with Southwest (1) all company loan records contained complete and accurate information and that the borrowers or co-borrowers shown in company loan records are in fact the true borrowers and co-borrowers and are the intended and actual recipients of the entire proceeds of their respective loans; (2) that the loans shown on company records were made for valuable consideration and not constitute valid and legally enforceable obligations of the respective persons shown as indebted on those records; (3) that all payments shown on company loan records, with the exception of payments made on the accounts shown in Exhibit A, were made by the persons shown on company loan records as indebted with respect to said loans.

> Settlement Agreement, ¶ 3.

23. Consideration given by Mr. Valdez to Southwest Financial under the Settlement Agreement included payment of $71,402.00, a three-year non-compete agreement, and a release of any claims of Mr. Valdez against Southwest Financial.

24. Neither Lainee Grubbs nor Shelly Wolfe is identified among the accounts listed on Exhibit A to the Settlement Agreement.

25. The loan to Shelly Wolfe that Southwest Financial asserts constitutes a breach under the Settlement Agreement is identified as loan number 14339 in the amount of $5,040.00.

6

*See* Defendant's Brief, Exhibit B, pages 53-54 (letter dated February 26, 2003 from Mr. Lee to Mr. Valdez with attachment); SW Response, Exhibit 21 (identifying the Wolfe loan as account number 14339).

26. The check representing the proceeds of the loan to Lainee Grubs was endorsed to Mr. Charles Gray. *See* SW Response, Exhibit 7.

27. At some point, Mr. Lee asserted that Mr. Valdez was in default under the Settlement Agreement and began to collect against some of the accounts identified on Exhibit A to the Settlement Agreement.

28. Southwest Financial filed a complaint against Mr. Tarango to collect on the unpaid balance of the Note and obtained a default judgment against Mr. Tarango on October 30, 2007.

29. Mr. Tarango filed a voluntary petition under Chapter 7 of the Bankruptcy Code on November 9, 2007 and listed the debt to Southwest Financial in his statements and schedules.

In addition to these undisputed facts, the following facts offered by Southwest Financial are uncontroverted:

1. All payments on the Wolfe loan account were made on the same dates as payments posted on accounts identified on Exhibit A to the Settlement Agreement. *See* SW Response, Exhibit 20, Affidavit of Gene Lee, paragraphs 11 and 14.

2. Mr. Valdez wrote a check payable to Southwest Financial in the amount of $1,350.00 on January 28, 2002. *See* SW Response, Exhibit 22. A payment was posted to the Wolfe account on the same date. *See* SW Response, Exhibit 20, Affidavit of Gene Lee, paragraph 15. The amount of the check equals the amounts posted on that day to other

7

accounts identified on Exhibit A to the Settlement Agreement plus the amount posted to

the Wolfe Account. *See* SW Response, Exhibit 20, Affidavit of Gene Lee, paragraph 15.

3. Ms. Wolfe was Mr. Valdez's daughter in law. *See* SW Response, Exhibit 26; Deposition

of Mr. Tarango, 14:14.

DISCUSSION

Southwest Financial's Motion for Summary Judgment

Southwest Financial requests the Court to enter summary judgment on its claim that the

debt at issue is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). That section provides, in

relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor
> from any debt—
>     (2) for money, property, services, or an extension, renewal, or refinancing of
> credit, to the extent obtained by –
>         (A) false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

The party seeking a determination of non-dischargeability under this section bears the burden of

proving, by a preponderance of the evidence, that: "[t]he debtor made a false representation; the

debtor made the representation with the intent to deceive the creditor; the creditor relied on the

representation; the creditor's reliance was [justifiable][1]; and the debtor's representation caused the

creditor to sustain a loss." *Fowler Bros v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.

1996). "False representations are 'representations knowingly and fraudulently made that give

rise to the debt.'" *In re Sutherland-Minor,* 345 B.R. 348, 354 (Bankr.D.Colo. 2006) (quoting

---

[1] *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d. 351 (1995) changed the standard of
reliance under 11 U.S.C. § 523(a)(2)(A) from "reasonable" to "justifiable."

*Cobb v. Lewis (In re Lewis),* 271 B.R. 877, 885 (10th Cir. BAP 2002)). False pretenses, as distinguished from false representations, "involve[] an implied misrepresentation that is meant to create and foster a false impression." *In re Bruce*, 262 B.R. 632, 636 (Bankr. W. D. Pa. 2001) (citing *In re Scarlata*, 127 B.R. 1004, 1009 (N.D. Ill. 1991)). The undisputed facts are sufficient to establish all elements required for a determination of non-dischargeability except with regard to the Defendant's intent to deceive.

### A. Whether Mr. Tarango Made a False Representation

Mr. Tarango executed the loan documents knowing that he would immediately give the proceeds of the loan to Mr. Valdez. In his Affidavit, Mr. Tarango stated that he and Mr. Valdez agreed that Mr. Tarango would "enter into the loan transaction . . . whereby I would apply for and obtain a loan from Southwest Financial, but Joe Valdez would make the payments on the loan." Affidavit of Joseph Tarango, ¶ 3 By signing the loan documents, Mr. Tarango represented to Southwest Financial that he was the borrower. This representation was false inasmuch as his arrangement from the outset was that the proceeds would go to Mr. Valdez and Mr. Valdez would be responsible for repaying the loan. But because a false representation within the meaning of 11 U.S.C. Section 523(a)(2)(A) must be both "knowingly and fraudulently made", and because false pretenses require that the misrepresentation be meant "to create and foster a false impression" Mr. Tarango's intentions at the time he signed the note are intertwined with this element. As discussed below, fact questions as to Mr. Tarango's intent at the time he executed the Note preclude summary judgment on Southwest Financial's non-dischargeability claim.

### B. Whether Southwest Financial Justifiably Relied on the False Representation

Mr. Tarango asserts that there can be no justifiable reliance on the part of Southwest Financial because it was the statements of its own employee, Mr. Valdez that Southwest Financial relied upon in extending the loan. In other words, because Mr. Valdez served as Southwest Financial's agent and participated in the transaction, his knowledge of the transaction is imputed to Southwest Financial, as his principal. This argument fails.

Ordinarily, "a principal is liable for the frauds and representations of his agent within the scope of his authority or employment even though he had no knowledge of such representations." *Amen v. Black,* 234 F.2d 12, 20 (10th Cir. 1956).[1] However, when a corporation's agent acts solely in his own interest and adversely to the interest of the corporation, knowledge of the improper acts taken by the corporation's agent is not imputed to the corporation.[2] This is known as the "adverse interest exception."[3] An exception to the exception, known as the "sole actor rule" "negates the adverse interest exception when the principal and agent are one and the same." *Official Committee v. Coopers & Lybrand,* 322 F.3d at 165 (citations omitted). The "sole actor rule" is not applicable here, since Mr. Valdez did not serve as both principal and agent. Gene Lee is the majority shareholder and director of Southwest Financial. The adverse interest exception therefore applies. By conducting a scheme whereby

---

[1] *See also, In re Melcher,* 319 B.R. 761, 770 (Bankr.D.Dist.Col. 2004)(noting generally, that "[u]nder agency law principles of nonbankruptcy law, a principal is charged with claims for fraud arising from his agent's false misrepresentations if the agent was authorized to act on the principal's behalf")(citing Restatement (Second) Agency, § 257).

[2] *See, Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322, F.3d 147, (2nd Cir. 2003)(noting that "knowledge and actions of a corporation's agent will not be imputed to the corporation if the agent was 'acting adversely to the corporation and entirely for his own or another's purpose' so that the agent's 'endeavors are so incompatible that they destroy the agency.'")(quoting *Askanase v. Fatjo,* 130 F.3d 657, 666 (5th Cir. 1997)).

[3] *See In re CBI Holding Co., Inc.,* 529 F.3d 432, 448 (2nd Cir. 2008)(explaining that under New York law, the adverse interest exception applies when "'the officer acted entirely in his own interests and adversely to the interests of the corporation.'")(quoting *Wight v. BankAmerica Corp.,* 219 F.3d 79, 87 (2nd Cir. 2000)).

Mr. Valdez used nominal borrowers and received the proceeds of those loans, he acted solely for his own benefit and adversely to the interests of Southwest Financial. Because Mr. Valdez's actions benefitted himself at the expense of his principal, Southwest Financial, he breached his duty as agent of Southwest Financial such that his knowledge of the fraudulent scheme should not be imputed to Southwest Financial.[4] Because Mr. Valdez's knowledge of the true nature of the transaction cannot be imputed to Southwest Financial, Southwest Financial's reliance on Mr. Tarango's misrepresentation in signing the loan documents while knowing that he would give the proceeds to Mr. Valdez was justifiable.

### B. Whether Southwest Financial Sustained a Loss

Mr. Tarango asserts that the default judgment obtained in the state court is not binding on the Bankruptcy Court, has no collateral estoppel effect, and, therefore, cannot support a finding that Southwest Financial sustained a loss. Ordinarily default judgments will not be given preclusive effect.[5] By not contesting the state court judgment, Mr. Tarango did not "actually litigate" the amount of the damages. But the fact that the default judgment may not be entitled to collateral estoppel effect does not negate other undisputed facts that demonstrate that a balance remains due. Mr. Tarango scheduled the debt to Southwest Financial in his bankruptcy schedules, and affirmatively stated in his affidavit that he did so because he "knew [he] . . would be legally responsible for repaying the loans." Mr. Lee's affidavit states that an outstanding balance remains. *See* Affidavit of Mr. Lee Southwest Financial attached as Exhibit 2 to the Reply ("Second Affidavit"). Thus, while the default judgment may not be sufficient to establish

---

[4] *Cf. In re Perkins,* 298 B.R. 778, 788- 789 (Bankr.D.Utah 2003)(stating that "[a]n agent's duties undoubtedly extend to refraining from self-dealing transactions which have the potential to benefit the agent at the expense of the principal.").

[5] *See In re Gordon,* 303 B.R. 645, 654 (Bankr.D.Colo. 2003)(stating that "[t]he general rule is that federal court default judgments have no collateral estoppel effect, because none of the issues is actually litigated.")(citation omitted); *In re Jordana,* 221 B.R. 950, 954 (Bankr.W.D.Okla. 1998), *aff'd,* 232 B.R. 469, *aff'd,* 216 F.2d 1087 (10th Cir. 2000)("The general rule is that a default judgment will not be granted preclusive effect.").

the damages amount, the evidence now before the Court is sufficient to establish that Southwest Financial has sustained a loss.

Mr. Tarango further asserts that because the value Southwest Financial received from Mr. Valdez through the Settlement Agreement far exceeded Mr. Tarango's loan amount, and because some portion of the value received must have been allocated to Mr. Tarango's loan account, Southwest Financial has not proven that it has sustained a loss. In support of this argument, Mr. Tarango attached as Exhibit F to his Response to Motion for Summary Judgment, a document entitled Settlement Agreement by and Between Southwest Financial Services of Las Cruces, Inc. and Joe D. Valdez, which reflects an allocation of the settlement proceeds to Mr. Tarango's account, with a reflected unpaid balance of zero. Exhibit F is inadmissible hearsay evidence, and cannot be considered by the Court on summary judgment.[6] Moreover, it is undisputed that Mr. Tarango signed the Note, and that he remains responsible for any unpaid indebtedness. The Second Affidavit of Mr. Lee states that "no portion of the Valdez stock sale proceeds was ever allocated to the Tarango loan" and that a "principal balance of $6,517.00 [remained on the Tarango loan] at the time of charge off," and that "the outstanding amount due under the Settlement Agreement exceeds that [sic.] amount due under the Tarango note." Second Affidavit, ¶¶ 3, 4. and 6. There is no evidence before the Court that Southwest Financial is attempting to recover more than its actual loss.[7] There is evidence before the Court that an outstanding

---

[6] Fed.R.Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."); *In re Wickens,* 416 B.R. 775, 776-777 (Bankr.D.N.M. 2009)( stating that "[h]earsay evidence cannot be considered on a motion for summary judgment" and that "[a]ny documentary evidence submitted in support of summary judgment must either be properly authenticated or self-authenticating under the Federal Rules of Evidence.")(citations omitted).

[7] *Cf. Summit Properties, Inc., v. Public Service Co. of New Mexico,* 138 N.M. 208, 222, 118 P.3d 716, 730 (Ct.App. 2005)(discussing the collateral source doctrine and stating that "the general rule is that a plaintiff may not recover more than his or her actual loss.")(citing *McConal Aviation, Inc. v. Commercial Aviation Ins. Co.,* 110 N.M. 697, 700, 799 P.2d 133, 136 (1990)).

12

balance remains due under the Tarango loan.  This is sufficient to establish that Southwest Financial sustained a loss.

    D.   Whether Mr. Tarango Intended to Deceive Southwest Financial

Questions of fact concerning a party's intent are difficult to resolve on summary judgment.[8]  But because a defendant rarely admits an intent to defraud, the Court may infer the requisite intent based on the surrounding facts and circumstances.[9]  "Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made."[10]  Under the facts present here, Mr. Tarango's alleged deceit is twofold: 1) signing the Note with no present intent to repay; and 2) misrepresenting to Southwest Financial that he was the true borrower.

Mr. Tarango asserts that because he knew that he would be legally responsible to repay the loan in the event Mr. Valdez failed to repay the loan, he did not intend to defraud Southwest financial.  His affidavit, filed in response to Southwest Financial's Motion for Summary Judgment, states that he "listed Southwest Financial in my schedules and statements because I knew that I was legally responsible for repaying the loans."  Tarango Affidavit, ¶ 9.  He further states that he "did not have any information or knowledge as to any of Southwest Financial's policies or procedures prohibiting loans to employees, employees' relatives or family members" and that "Joe Valdez, at no time, told me that he was violating any of Southwest Financial's

---

[8] *See Compton v. Herrman (In re Herrman)*, 355 B.R. 287 (Bankr.D.Kan.2006)(stating that, "[a]s a general rule, questions involving a person's intent or other state of mind cannot be resolved on summary judgment.")(citing *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir.1980)(remaining citation omitted). *See also, Sutherland-Minor,* 345 B.R.at 356 (stating that "[e]ven if the Defendant had admitted making false representations, summary judgment is difficult to obtain when the issue is the intent of one of the parties."(citation omitted).

[9] *See In re Young,* 91 F.3d at 1375 (stating that fraudulent intent may be inferred based on the "totality of circumstances")(citations and internal quotations omitted)); *In re Abraham*, 247 B.R. 479, 483 (Bankr.D.Kan.2000)(stating that "[s]ince a promisor does not usually admit fraudulent intent, the plaintiff must prove circumstances substantial enough to support an inference that there was intent to defraud.")(citation omitted)

[10] *Mercantile Bank v. Canovas,* 237 B.R. 423, 428 (Bankr.N.D. Ill. 1998)(citation omitted).

policies or procedures." Tarango Affidavit, ¶¶ 6 and 7. In other words, Mr. Tarango states he intended at the outset that he would ultimately be called upon to repay the loan in the event Mr. Valdez failed to pay and he did not believe that by representing he was the borrower while knowing that he would give the proceeds to Mr. Valdez created an improper false impression. These statements create a sufficient question of fact regarding Mr. Tarango's knowledge and intent at the time of the loan that preclude the Court from granting summary judgment in favor of Southwest Financial.

Defendant's Motion for Summary Judgment

A. Whether Mr. Tarango is an Intended Third Party Beneficiary of the Settlement Agreement.

Mr. Tarango asserts that he is an intended third party beneficiary of the settlement agreement pursuant to which Southwest Financial was obligated to treat his loan as paid in full provided Mr. Valdez was not in default under its terms. Mr. Tarango further asserts that there has not been a breach of the Settlement Agreement. "'Ordinarily, the obligations arising out of a contract are due only to those with whom it was made,'" so that a party who is not a party to the contract nor in privity with a party to the contract cannot seek to enforce the contract. *Tarins, Inc. v. Tinley,* 129 N.M. 185, 190, 3 P.3d 680, 685 (Ct. App. 1999)(quoting 17A Am.Jur.2d *Contracts* § 425 (1991)). An exception to this general principle of contracts applies to intended third party beneficiaries. *See Fleet Mortgage Corp. v. Schuster,* 112 N.M. 48, 49, 811 P.2d 81, 82 (acknowledging that "[a] third party may be a beneficiary of such contract, and as a beneficiary may have an enforceable right against a party to the contract.")(citation omitted). Under New Mexico law, only intended third party beneficiaries have standing to seek enforcement of a contract to which he or she is not a party. *Tinley,* 129 N.M. at 191, 3 P.3d at

14

686.  It is not necessary that the contract specifically name the third party beneficiary in order for the third party beneficiary to enforce the contract. *See Stotlar v. Hester,* 92 NM 26, 30, 582 P.2d 403, 407 (Ct.App. 1978)("A third party beneficiary does not have to be named in the contract."). "The paramount indicator of third party beneficiary status is a showing that the parties to the contract intended to benefit the third party." *Valdez v. Cillessen & Son, Inc.,* 105 N.M. 575, 581, 734 P.2d 1258, 1264 (1987)(citation omitted). *See also Dona Ana Mut. Domestic Water Consumers Ass'n v. City of Las Cruces, NM,* 516 F.3d 900, 907 ("'a prime requisite to this [third-party beneficiary] status is that the parties to the contract must have intended to benefit the third party, who must be something more than a mere incidental beneficiary.")(quoting *McKinney v. Davis,* 84. N.M. 352, 353, 503 P.2d 332, 333 (1972)).  The party claiming third-party beneficiary status bears the burden of proving that the parties to the contract intended to benefit him.  *Tinley,* 129 N.M. at 191, 3 P.3d at 686.

New Mexico follows the definition of third party beneficiary status as described in Corbin on Contracts.  *Permian Basin Inv. Corp. v. Lloyd,* 63 N.M. 1, 7, 312 P.2d 533, 537 (1957).  As adopted by the court in *Permian Basin:*

> A third party who is not a promisee and who gave no consideration has an enforceable right by reason of a contract made by two others (1) if he is a creditor of the promisee or of some other person and the contract calls for a performance by the promisor in satisfaction of the obligation; or (2) if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.  A third party may be included within both of these provisions at once, but need not be.  One who is included within neither of them has no right, even though performance will incidentally benefit him.

> *Permian Basin,* 63 N.M. at 7, 312 P.2d at 537 (quoting Corbin on Contracts, Vo. 4, § 776, pp. 18, 19).

Mr. Tarango appears to meet the second class of third party beneficiaries described in *Permian Basin.* Southwest Financial's agreement to conditionally forbear collection against the accounts listed on Exhibit A is a pecuniary benefit to Mr. Tarango. Further, the language in the Settlement Agreement providing that Southwest Financial promises to treat the accounts listed on Exhibit A as paid in full, so long as Mr. Valdez is not in default, indicates that Southwest Financial had reason to know that the benefit to the persons on Exhibit A of conditional forbearance was one of Mr. Valdez's motivating factors in entering into the agreement.

Southwest Financial asserts that Mr. Tarango is, at best, only an incidental beneficiary of the Settlement Agreement, and therefore, is not entitled to enforce it. Southwest Financial argues that the language in the Settlement Agreement providing that it would not be required to report the accounts listed on Exhibit A to the Settlement Agreement as "settled or paid in full" indicates its intent not to benefit any of the parties identified on Exhibit A. But this position is belied by Mr. Lee's affidavit testimony stating that he considered Southwest Financial's promise to treat the loans identified in Exhibit A as paid in full conditional upon Mr. Valdez not being in default under the Settlement Agreement. *See* SW Response, Exhibit 20, Affidavit of Gene Lee, ¶ 4. In addition, it does not appear that Mr. Lee began collection efforts until *after* he declared a default under the Settlement Agreement. The Settlement Agreement is dated November 3, 2003, yet the default judgment obtained against Mr. Tarango is dated October 30, 2007. The delay in Southwest Financial's collection efforts further supports the conclusion that the parties identified on Exhibit A were intended third-party beneficiaries. The evidence now before the Court is indicative of a third-party beneficiary situation. But because third party beneficiary status is dependent upon the intention of the parties to the contract, the Court will defer its conclusion that

16

Mr. Tarango is a third party beneficiary of the Settlement Agreement until it can weigh the evidence presented at trial.

       B.   <u>Whether there is a Material Breach of the terms of the Settlement Agreement</u>

Mr. Tarango attached to his Motion the deposition testimony of Mr. Lee concerning when he became aware of the loan to Lainee Grubbs. In a prior case before this Court, Mr. Lee executed an affidavit which stated that he did not become aware of the loan to Ms. Grubbs until the fall of 2004. *See* Defendant's Exhibit B. The Court relied on this statement to find that there was a breach of the Settlement Agreement. *See* Adversary Proceeding No. 06-1078, Docket No. 37. In fact, Mr. Lee identified the loan to Ms. Grubbs in the correspondence sent to Mr. Valdez when Mr. Lee first discovered that there were several questionable accounts on Southwest Financial's books and records. *See* Memorandum Brief in Support of Defendant's Motion for Summary Judgment ("Defendant's Brief"), Exhibit B, pages 53 – 54 (letter dated February 26, 2003 from Mr. Lee to Mr. Valdez identifying Account Number 15217 for Lainee Grubbs among the "list of accounts . . . about which for various reasons questions have arisen.")

Mr. Tarango asserts that there can be no breach of the Settlement Agreement based on the failure to list the loan to Lainee Grubbs in Exhibit A because the loan to Lainee Grubbs was a loan that Mr. Lee already had reason to suspect was improper. The implication is that if Mr. Lee knew that the loan to Lainee Grubbs was one of the improper loans and caused it to be left off Exhibit A to the Settlement Agreement, he was setting Mr. Valdez up for an automatic breach of the Settlement Agreement. Mr. Tarango asserts that because Mr. Lee had reviewed all the information that would identify the loan to Ms. Grubbs as an improper loan, including the fact that the check for the proceeds of the loan was endorsed to Charles Gray, one of the parties

identified on Exhibit A, that the omission of this loan from Exhibit A cannot constitute a default under its terms.

      Mr. Lee's Affidavit contains the following statements:

      3.     Southwest's and my purpose in exacting 3.a) through 3.f) of the promises and affirmations from Valdez found in paragraph 3 of the Settlement Agreement was to confirm with Valdez that he had been totally honest and forthright with me and Southwest in identifying all loans by which he, Valdez, had obtained funds from Southwest surreptitiously and without the authorization or knowledge of Southwest's other principals and that, besides these types of loans, the loans proceeds disbursed on all other loans made during Valdez' association with Southwest were intended for and in fact received by the borrowers recorded in the books and records of Southwest for each particular loan.  In the instances where Valdez improperly obtained Southwest finds Valdez requested third parties to execute Promissory Notes in favor of Southwest and, in exchange for assuring these third parties that he (Valdez) would be responsible for paying the Notes, these third parties gave to [sic.] loan proceeds to Valdez.  The proceeds of these loans, ostensibly for bona fide borrowers, were instead intended for, and in fact received by Valdez.  In at least three cases this third party was Charles Gray.  However, Southwest did not wish to accept or stipulate that Valdez's list of identified loan accounts (Exhibit A) was exhaustive or all inclusive in case Southwest later discovered loans which should have been listed in Exhibit A but were omitted.  Also, since under the Agreement Southwest was accepting only partial payment for the accounts listed in Exhibit A, Southwest required as one material consideration for entering into the Agreement that Valdez make the affirmation in paragraph 3(f) of the Settlement Agreement.

      5.  In the Fall of 2004, I became aware of a loan and borrower (Grubbs) not disclosed in Settlement Agreement Exhibit A and not brought to my attention by Joe Valdez according to any of the other terms of the Settlement Agreement that should have been disclosed by Valdez.  I knew the existence of the Grubbs loan before 2004, but I did not know the true nature of the Grubbs loan.  In this loan transaction the borrower signed the loan documents.  She supposedly obtained the loan check, which contains on the back an endorsement to a third party, specifically Charles Gray.  Gary [sic.] who is also listed by Joe Valdez in Exhibit A for three other transactions, in turn then made arrangements to pay some or all of the borrower's loan installments.  At the very least the circumstances of this loan are contrary to the affirmation Joe Valdez made in paragraphs 3(f)(1) and 3(f)(3) of the Settlement Agreement.

      Affidavit of Gene Lee, ¶¶ 3.and 5.

These statements are insufficient for the Court to determine that there has been a material default under the Settlement Agreement. "[A] material breach is 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'" *Famiglietta v. Ivie-Miller Enterprises, Inc.,* 126 N.M. 69, 74, 966 P.2d 777, 782 (Ct.App. 1998)(quoting *Ervin Constr. v. Van Orden,* 125 Idaho 695, 874 P.2d 506, 510 (Idaho 1993)). In other words, the default must be so fundamental to the contract, that the default defeats an essential purpose of the contract. *Id.* (citation omitted). In assessing the materiality of a breach, one factor identified in the Restatement 2d Contracts Section 241 is the extent that the non-breaching party will be deprived of the benefit he reasonably expected to receive. Southwest Financial claims that Mr. Valdez breached the contract in two ways: 1) by failing to list the loan to Lainee Grubbs and the loan to Shelly Wolfe on Exhibit A to the Settlement Agreement; and 2) that the Lainee Grubbs loan and the Shelly Wolfe loan violate the provisions of 3(f) of the Settlement Agreement. Upon review of the evidence now before the Court, the Court finds that fact questions remain as to whether there is a material breach under the Settlement Agreement.

<u>Omission of the loans to Lainee Grubbs and the Loan to Shelley Wolfe from Exhibit A to the Settlement Agreement</u>

Mr. Lee's affidavit does not explain why the loans to Lainee Grubbs and to Shelley Wolf were omitted from the list. It is possible that Mr. Lee and Mr. Valdez together determined that these loans should not be included as part of the Settlement Agreement. Mr. Lee's deposition testimony suggests as much, while his affidavit does not offer any further explanation. *See* Defendant's Exhibit B – Deposition of Gene Lee dated June 25, 2008, page 180, lines 10 – 13 (Q. And which you then omitted from the Exhibit A attached to Exhibit 1 to this deposition right? A. We both omitted it."). Given, in part, that Mr. Lee had to modify the statement in his

19

prior affidavit in order to acknowledge that he, in fact, knew of the existence of the loan to Ms. Grubbs before 2004, the Court finds that it is not appropriate to grant summary judgment on this issue without having an opportunity to assess the credibility of the witness at trial.[11]

Southwest Financial points out in its Response that Mr. Valdez participated in the Grubbs loan transaction by preparing the loan documents, and asserts that its loan policies were not followed and the loan should have been included on Exhibit A to the Settlement Agreement. Yet the Settlement Agreement is aimed specifically at loans wherein Mr. Valdez took out the loan under a nominal borrower and obtained the proceeds for his own benefit. The Recitals contained in the Settlement Agreement reference the fact that Mr. Valdez "made a number of loans to third parties, or in the name of third parties, the proceeds of which were intended for and in fact received by [Mr.] Valdez", and then state that "[t]he amount due Southwest [Financial] from [Mr.] Valdez for the total outstanding balance on the accounts . . . in question is $142,886.00, as detailed in Exhibit A of this Agreement which is attached hereto and by this reference made a part hereof." *See* Settlement Agreement, Recitals, ¶¶ 3) and 6).

Although this language is not entirely clear, it strongly suggests that only those loans for which Mr. Valdez received the proceeds were to be included on Exhibit A to the Settlement Agreement. Mr. Valdez did not receive the proceeds from the loan to Lainee Grubbs; Mr. Gray did. The check representing the proceeds of that loan was endorsed to Mr. Gray. It is not clear from the record that omission of this loan from Exhibit A to the Settlement Agreement constituted a breach of the Settlement Agreement. Further, the loan to Lainee Grubbs is materially different from the other loans which were the target of the Settlement Agreement.

---

[11] *See In re Rafter Seven Ranches L.P.,* 414 B.R. 722, 736 (10th Cir. BAP 2009)( noting that "[c]ourts are reluctant to grant summary judgment when the disposition of a case turns on a determination of intent because the resolution of that issue "depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination.'")(quoting *Morrison v. Nissan Motor Co., Ltd.,* 601 F.2d 139, 141 (4th Cir. 1979).

Thus its omission from Exhibit A to the Settlement Agreement could be immaterial because it does not touch the fundamental purpose of the contract: identifying the loans in which Mr. Valdez personally benefitted by receiving the proceeds from a nominal borrower.

Southwest Financial asserts that, regardless of whether the omission of the loan to Lainee Grubbs from Exhibit A to the Settlement Agreement constitutes a default under the terms of the Settlement Agreement, the omission of the loan to Shelley Wolfe from Exhibit A to the Settlement Agreement constituted a second breach of the terms of the Settlement Agreement by Joe Valdez. Southwest Financial has offered circumstantial evidence that Mr. Valdez made a payment on the loan. It is undisputed that Ms. Wolfe was Mr. Valdez's daughter in law, that the only payments on the Wolfe loan were made on the same dates as payments made on other sham loans identified on Exhibit A, and that the amount of a check Mr. Valdez made payable to Southwest Financial equals the total payments to loans identified in Exhibit A to the Settlement Agreement plus the amount paid on the Wolfe loan account on that date. Southwest Financial would have the Court infer from these circumstances that the loan to Ms. Wolfe is the same type of loan as the other loans identified in Exhibit A. Because there is no evidence that Ms. Wolfe obtained this loan at the direction of and for the benefit of Mr. Valdez, or that Mr. Valdez receive the loan proceeds, the Court will not conclude that the loan to Ms. Wolf is the type of loan that Mr. Valdez was required to identify on Exhibit A to the Settlement Agreement.

<u>Whether there has been a Material Breach of the Terms of Paragraph 3(f) to the Settlement Agreement</u>

Southwest Financial has offered Mr. Lee's affidavit testimony stating that Mr. Valdez's affirmations in paragraph 3(f) were required so that Southwest Financial could be assured that "besides these types of loans, the loans proceeds disbursed on all other loans made during Valdez' association with Southwest were intended for and in fact received by the borrowers

21

recorded in the books and records of Southwest for each particular loan." But the language in paragraph 3(f) is so broad that it could cover loans that Mr. Valdez would have no reason to suspect. Because the heart of the Settlement Agreement appears to relate to the loans that Mr. Valdez obtained through nominal borrowers for his own benefit, the Court will not conclude based on Mr. Lee's affidavit testimony that the failure to list the loan to Lainee Grubbs constituted a material breach of paragraph 3(f) of the Settlement Agreement.

Finally, Southwest Financial asserts that Mr. Valdez's payment on Ms. Wolfe's loan violates the language contained in paragraph 3(f) of the Settlement Agreement, which affirms that "all payments shown on company loan records, with the exception of payments made on the accounts shown on Exhibit A, were made by the persons shown on the company loan records indebted with respect to said loans." But, because it has not been established for purposes of summary judgment that the Wolfe loan is the same type of loan as the loans on Exhibit A, a technical violation of paragraph 3(f)(3) may not be material.[12] And though "the existence or extent of a monetary damage caused by a breach of contract is not necessarily dispositive of the question of materiality,"[13] given the size of the loan to Ms. Wolfe (less than $6,000) in relation to the combined total of the other loans at issue (over $100,000), it is not appropriate to determine on summary judgment that this violation (a payment made on a loan by someone other than the borrower) constitutes material breach of the Settlement Agreement.

---

[12] *See Famiglietta,* 126 N.M. at 74 (noting that "[s]ome courts have described a material breach as the "failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.'")(quoting *Horton v. Horton,* 487 S.E.2d 200, 204 (Va. 1997)).

[13] *Famiglietta,* 126 N.M. at 74, 966 P.2d at 782 (citation omitted).

Based on the foregoing, the Court concludes that both motions for summary judgment must be denied. Appropriate orders consistent with this memorandum opinion will be entered.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: January 7, 2010

COPY TO:
James A. Askew
Attorney for Southwest Financial Services of Las Cruces, Inc.
PO Box 1888
Albuquerque, NM 87103

R. Trey Arvizu, III
Attorney for Joseph Tarango
PO Box 1479
Las Cruces, NM  88004